**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Jeanette Centeno, | No. CV-18-01059-PHX-SMB |
| Plaintiff, | **ORDER** |
| v. | |
| American Liberty Insurance Company, | |
| Defendant. | |

Pending before the Court is Defendant American Liberty Insurance Company's (hereinafter "American Liberty") Motion for Summary Judgement. (Doc. 95, "Mot."). Plaintiff Jeanette Centeno ("Centeno") filed a Response. (Doc. 104, "Resp."). American Liberty filed a Reply. (Doc. 108, "Reply"). American Liberty filed a Separate Statement of Facts in Support of his Motion. (Doc. 96, "DSOF"). Centeno also filed an Additional Statement of Facts in Support of her Response, (Doc. 105, "PSOF"), and included a controverting statement of facts as required by LRCIV 56.1(b). Oral argument was held on September 13, 2019. The Court has read and considered the Motion, Response, and Reply and enters the following Order.

**I. BACKGROUND**

Centeno worked as a traveling nurse for Beech Home Care ("Beech"), providing medical care and treatment to patients in their homes. (PSOF at 2). On Friday, August 5, 2016, while retrieving medical supplies from her vehicle to continue treatment of a patient, Centeno allegedly fell and injured her back. (*Id.*). The injury was not witnessed.

Immediately following her accident, Centeno returned to the patient's home and continued treatment with fellow nurse, Roxanne Jeuckstock. (PSOF at 2). The two nurses left separately but reconvened shortly thereafter to treat the last patient of the day. (*Id.*). Centeno first reported her alleged injury to Beech the following Monday, August 8, 2016 and first sought medical care later that day at Chandler Regional Medical Center. (DSOF ¶ 6). The reports of Centeno's attending physician and radiologist who both administered treatment that day differ as to whether the injury occurred during or after work. (DSOF Exh. 10 at 1 (Physician's Report); DSOF Exh. 10 at 110-111 (Radiologist's Report)). Three weeks passed before Centeno next sought medical treatment by visiting her personal physician on August 25, 2016. (DSOF ¶ 9). After complaining of continued back and neck pain to supervisors, Centeno visited a Workers Compensation clinic with Beech's leave on August 29, 2016, after which she was recommended for light duty. (DSOF ¶ 10). On September 1, 2016, nearly a month after her accident, Centeno's injury was reported to Defendant, American Liberty Insurance Company ("American Liberty") for the first time. (*Id.*).

American Liberty immediately assigned the claim to adjuster Randi Kerner ("Kerner") of S&C Claim Services ("S&C"). (DSOF ¶ 11). Kerner initiated an investigation, contacted Centeno, Beech, and Centeno's medical providers, and determined the claim was initially compensable on September 13, 2019. (*Id.*). Centeno was then assigned a nurse case manager to coordinate further medical evaluation with a supervising physician. (DSOF ¶ 17). Shortly thereafter, the initial approval of Centeno's claim was thrown into doubt by two co-workers' independent reports indicating that Centeno's injury was not job-related.[1] (DSOF ¶¶ 18-22). On September 19, 2016, Beech disclosed to Kerner that Centeno had told a fellow employee, Karen Katsaros, that the injury was caused by a fall in Centeno's home on Sunday, August 7, 2019. (DSOF ¶ 18). Consistent with this report, on September 30, 2016, Beech provided Kerner with the written statement of

---

[1] Centeno did not depose either Katsaros or Jeuckstock. In their interviews with DBA, both nurses indicate that their statements to Beech were voluntary and unprompted. *See* (Doc. 96, Exh. 2 at 64 (Katsaros), 76 (Jueckstock)).

Roxanne Jueckstock, the nurse being trained by Centeno on the day of the alleged accident. (DSOF ¶¶ 20, 22). Among other things, Jueckstock insisted that Centeno did not exhibit any signs or symptoms or injury, nor complain of an injury either before or after the time of alleged accident. (DSOF ¶ 21). Of note to Kerner, the two nurses had treated every patient together that day, including one patient immediately after Centeno's accident. (PSOF at 2). Also on September 30, 2016, S&C asked a third-party adjuster, Dan Boozer Adjustment ("DBA"), to investigate these adverse reports while continuing to approve Centeno's medical treatment for what was diagnosed as pre-existing spinal stenosis aggravated by the accident. (DSOF ¶ 23). S&C continued to authorize Centeno's medical treatment to include the scheduling of physical therapy sessions, pre-operative surgical appointments, and the setting of a tentative surgery date of October 20, 2016. (DSOF ¶ 24).

On October 13, 2016, noting the upcoming Industrial Commission of Arizona ("ICA") final claim determination deadline of October 18, 2016, S&C denied Centeno's claim, in part due to the conflicting accounts of co-workers indicating the injury occurred outside of work and therefore was non-compensable. (DSOF ¶ 44). S&C also cited the minimal medical treatment sought in the three-week period immediately following the accident and Centeno's delay in reporting the claim to American Liberty as additional support for claim denial. (DSOF ¶ 36). Despite denying Centeno's claim, S&C continued to investigate the conflicting co-workers reports.[2] DBA interviewed Katsaros on October 13, and Jueckstock on October 20, considering both their accounts credible.[3] S&C maintains that the timing of the denial—five days before the ICA claim deadline—was motivated by a desire to meet the ICA deadline and allow Centeno to pursue other surgery options given her approaching surgery date. (DSOF ¶ 46). Following denial of her claim, Centeno postponed surgery. She contested her claim denial on October 31, 2016. (DSOF

---

[2] The parties disagree as to whether S&C was prepared to reverse its declination if the interviews of Jueckstock and Katsaros "uncovered any additional information supporting compensability." (DSOF ¶ 48; PSOF at 7).
[3] DBA also conducted an interview with Centeno on October 11, 2016. S&C considered this interview in claim denial. (DSOF ¶¶ 38-40).

₱ 43).

On June 7, 2017, the ICA reversed and determined that Centeno's claim was compensable. (DSOF ₱ 45).[4]

## II. LEGAL STANDARD

Summary judgment on a claim or defense is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In order to prevail, a party moving for summary judgment must show the absence of a genuine issue of material fact with respect to an essential element of the non-moving party's claim, or to a defense on which the non-moving party will bear the burden of persuasion at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 242, 257 (1986). If the movant fails to carry its initial burden, the nonmovant need not produce anything. *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102–03 (9th Cir. 2000).

However, if the movant meets its initial responsibility, the burden shifts to the nonmovant to establish the existence of a genuine issue of material fact. *Id.* at 1103. The nonmovant need not establish a genuine issue of fact conclusively in its favor, but it "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Bare assertions, standing alone, are insufficient to create a genuine issue of material fact and defeat a motion for summary judgment. *See Liberty Lobby*, 477 U.S. at 247–48. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249–50 (citations omitted). In deciding a motion for summary judgment, the court draws all reasonable inferences in favor of the non-movant and recognizes that "[c]redibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Id.* at 255. However, conclusory and speculative testimony does not raise genuine issues of fact and is

---

[4] In reversing, the ICA judge accorded greater deference to Centeno's account. Among other things, the ICA determined that Jueckstock's memory loss, the result of a traffic accident that occurred after her October 20, 2016 interview with American Liberty, made her testimony before the ICA less credible. (DSOF ₱ 54).

- 4 -

insufficient to defeat summary judgment. *See Thornhill Publ'g Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

**III.    DISCUSSION**

    **a. Bad Faith Insurance Claims Under Arizona Law**

Arizona recognizes the tort of insurance bad faith. *See Deese v. State Farm Mut. Auto. Ins. Co.*, 838 P.2d 1265, 1267 (Ariz. 1992). An insurance contract imposes an implied legal duty on the insurance company to "act in good faith in dealing with its insured on a claim." *Noble v. Nat'l Am. Life Ins. Co.*, 624 P.2d 866, 868 (Ariz. 1981). Bad faith "arises when the insurer 'intentionally denies, fails to process or pay a claim without a reasonable basis.'" *Zilisch v. State Farm Mut. Auto. Ins. Co.*, 995 P.2d 276, 279 (Ariz. 2000) (quoting *Noble*, 624 P.2d at 868). To establish bad faith, "a plaintiff must show the absence of a reasonable basis for denying benefits of the policy and the defendant's knowledge or reckless disregard of the lack of a reasonable basis for denying the claim." *Deese*, 838 P.2d at 1267–68 (quoting *Noble*, 624 P.2d at 868); *see also Echanove v. Allstate Ins. Co.*, 752 F. Supp. 2d 1105, 1110 (D. Ariz. 2010) ("[I]f an insurer's conduct is reasonable or fairly debatable, there is no liability for bad faith"). Bad faith thus has two elements: (1) that the insurer acted unreasonably toward the insured; and (2) that the insurer acted knowingly or with reckless disregard of the unreasonableness of its actions. *See Zilisch*, 995 P.2d at 238. The first inquiry is an objective analysis, while the second "involves a subjective analysis as to 'whether the insurer *knew* that its conduct was unreasonable or acted with such reckless disregard that such knowledge could be imputed to it.'" *Young v. Allstate Ins. Co.*, 296 F. Supp. 2d 1111, 1115 (D. Ariz. 2003) (quoting *Deese*, 838 P.2d at 1265 (emphasis in original)).

Where an insurance company has a reasonable basis for denying a claim, or where the claim is fairly debatable, a cause of action for bad faith will not lie. *Trus Joist Corp. v. Safeco Ins. Co. of Am.*, 153 Ariz. 95, 104 (1988). Indeed, Arizona law recognizes that while the insurance relationship "requires insurers to give equal consideration to the needs of their insureds and not treat the claims process as a battlefield . . . [i]nsurers can challenge

claims that are 'fairly debatable'." *Demetrulaias v. Wal-Mart Stores Inc.*, 917 F.Supp.2d 993, 1005 (D. Ariz. 2013) (citing *Rawlings v. Apodaca*, 151 Ariz. 149, 160 (1986)). Generally, an insurer's "belief in fair debatability 'is a question of fact to be determined by the jury.'" *Zilisch*, 995 P.2d at 279 (quoting *Sparks v. Republic Nat'l Life Ins. Co.*, 647 P.2d 1127, 1137 (Ariz. 1982)). However, when a plaintiff offers no significantly probative evidence that calls into question the insurer's belief that the claim is debatable, the Court may enter judgment as a matter of law. *See Temple v. Hartford Ins. Co. of Midwest*, 40 F.Supp.3d 1156, 1166 (D. Ariz. 2014); *Aetna Cas. & Sur. Co. v. Superior Court In & For Cnty. Of Maricopa*, 778 P.2d 1333, 1336 (App. 1989) ("[T]here are times when the issue of bad faith is not a question appropriate for determination by the jury.").

### b. Centeno's Bad Faith Claim

American Liberty moves for summary judgment. As mentioned above, under Arizona law, the plaintiff must show the insurer acted unreasonably and "that the insurer must intent the act or omission and must form that intent without reasonable or fairly debatable grounds." *Rawlings*, 726 P.2d at 576. American Liberty contends that Centeno cannot establish either. Specifically, they argue the record does not show a genuine dispute of a material fact showing objectively unreasonable conduct or the required intent to prove bad faith. This Court agrees.

Centeno's claim was initially accepted. (DSOF ¶ 16; PSOF at 7). Once accepted, medical care was promptly authorized and fully compensated. (DSOF ¶ 10; PSOF at 2-5). Centeno does not dispute that two co-workers independently reported information indicating that her injuries were not work-related and, thus, non-compensable. (DSOF ¶¶ 18-22; PSOF at 4). She does not dispute that American Liberty investigated these reports through a third party, DBA, and considered the reports credible. (DSOF ¶¶ 47-53; PSOF at 4-6). She does not dispute the additional facts informing American Liberty's denial of her claim—the month-long delay in the report of the injury to the insurer and the minimal medical treatment sought during that period. (DSOF ¶ 36; PSOF at 7). She does not dispute that American Liberty continued to authorize her treatment despite this evidence.

(PSOF at 5). Likewise, she does not contend that there was any unreasonable delay in the authorization of medical treatment from the time the claim was made until it was denied on October 13, 2016. (DSOF ⁋ 56; PSOF at 7). Centeno does not dispute that her claim was denied before the ICA deadline. (PSOF at 7). Importantly, she does not dispute that, if credible, these reports provide reasonable grounds to deny a workers compensation claim. (*Id.*). In short, the record lacks any genuine dispute of a material fact showing American Liberty's conduct was objectively unreasonable or that American Liberty believed Centeno's claim was not "fairly debatable." *See Trus Joist Corp.*, 153 Ariz. at 104. Finding no genuine dispute as to a material fact, the burden shifts to the non-moving party. *See Nissan Fire & Marine Ins. Co.*, 210 F.3d at 1103. Accordingly, the Court turns to Centeno's argument. *See Temple*, 40 F.Supp.3d at 1166 (finding summary judgment appropriate "if the insured offers no significantly probative evidence that calls into question the insurer's subjective belief in fair debatability").

Fundamentally, Centeno contends that American Liberty unreasonably denied her claim to save money. From her viewpoint, any alleged unreasonable conduct on the part of American Liberty is explained by a pretextual financial motive. Specifically, Centeno argues that a nefarious cost-saving motive is shown by American Liberty's objectively unreasonable conduct in (1) the timing of the denial of her claim, (2) an alleged violation of internal claims processing policy, (3) an alleged improper evaluation of medical evidence, and (4) an alleged failure to fully investigate. Centeno presents no additional evidence of American Liberty's subjective unreasonableness. (Resp. at 15). She suggests that, here, the requisite intent is imputed by American Liberty's unreasonable conduct. (*Id.*). The Court disagrees.

As an initial matter, Centeno presents insufficient evidence to support the contention that American Liberty pretextually denied her claim because of financial motivation. Centeno's sole evidence of such alleged motive is an excerpted section from the website of the claim handler, S&C, titled "Philosophy".[5] (PSOF Exh. 3). However, as American

---

[5] The "Philosophy" outlines S&C's responsibilities and goals both to employers and injured workers. Excluded from Plaintiff's account is any notion that S&C believes that

- 7 -

Liberty correctly notes, this "Philosophy" section simply affirms the respective duties owed by an insurer to both the insured employer and the injured employee—to include a duty to approve only meritorious claims. (Reply at 9). Not only is this type of general mission statement unobjectionable,[6] it falls far short of the type of arbitrary goals for claims reduction found troublesome by previous courts. *See e.g., Zilisch*, 995 P.2d at 280 (finding that arbitrary goals for claims reduction and linking employee salaries and bonuses to claim payouts provided evidence "from which a jury could find that State Farm acted unreasonably and knew it"); *Demetrulaias*, 917 F.Supp.2d at 1009 (identifying employer practices and policies that "set monthly and annual goals to close workers compensation files" in denying summary judgment). Further, to establish bad faith, a plaintiff must demonstrate that its insurer acted unreasonably with respect to the *plaintiff's* claim. *See 77th St. v. Am. Fam. Mut. Ins. Co.*, No. 2:12-cv-01910, 2014 WL 12538165 at *11-12 (D. Ariz. Jul. 25, 2014) (holding that training materials outlining pressure tactics designed to compel an insured to accept lower payments could not support liability absent evidence such tactics were used). Outside of conclusory inferences, Centeno does not show that this "Philosophy" is considered in American Liberty's evaluation of claims generally, much less in the consideration of her claim specifically. Evidence of an insurer's allegedly inappropriate claims management practices does not prove bad faith unless those practices were applied to the insurer's handling of the plaintiff's particular claim. *See, e.g., Taft v. Am. Family Mut. Ins. Co.*, No. CV-11-2599, 2013 WL 5498226, at *6 (D. Ariz. Oct. 1, 2013) ("[I]nstitutional bad faith is not a commonly recognized and accepted legal claim.") (internal quotation marks omitted); *Milhone v. Allstate Ins. Co.*, 289 F.Supp.2d 1090, 1102 (D. Ariz. 2003) ("[B]ecause all of the above general allegations of bad faith, assuming they are true, did not affect the processing of Plaintiff's claim *in this case* the court finds that a cause of action for bad faith cannot lie based on these allegations. In other words, if

---

"legitimate injured workers should be treated fairly, and given the best treatment possible." (PSOF Exh. 3).

[6] The Court is not surprised when a business is motivated by profit. *See Knoell v. Metropolitan Life Ins. Co.*, 163 F.Supp.2d 1072, 1078 (D. Ariz. 2001) ("The evolution of the law of bad faith has not reached the point where it is wrong for the insurance company to make a profit, much less follow good business practices.").

Plaintiff was not personally damaged by the allegedly inappropriate practices, Plaintiff cannot base his claim on such practices.") (emphasis in original). Here, Centeno falls far short of the mark.

Centeno also fails to prove American Liberty's conduct in handling her claim was objectively unreasonable. First, regarding the timing of the denial of her claim, Centeno does not identify any particular delay in the processing of her claim as unreasonable. The claim was initially deemed compensable on September 13, 2016, shortly after it was received. (DSOF ¶ 16). It was denied one month later, five days before the ICA claim determination deadline. (DSOF ¶ 44). Centeno disputes the contents, but not the existence, of the Jeuckstock and Katsaros statements. (PSOF at 7-8). Rather, she argues that American Liberty, aware of the increasing costs of her treatment, denied the claim to save money.[7] (Resp. at 8-9). Specifically, Centeno infers that once American Liberty realized the cost of Centeno's recommended surgery, the statements of Jeuckstock and Katsaros provided a pretextual basis to deny her claim. Without any evidence to make this inference reasonable or show a single instance where cost was considered in her claim evaluation, the Court will not indulge in such a tenuous inferential leap.

Second, the alleged violations of internal claims processing procedures do not create a reasonable inference to either impute reckless intent or show that evaluation of Centeno's claim was objectively unreasonable. The primary support Centeno offers for this assertion is the declaration and deposition of its expert, Frank Weedon. (PSOF Exh. 1). As American Liberty points out, Mr. Weedon's testimony is conclusory, generally speculative in nature, and "merely states contrary opinions without factual predicates." *Hoa v. State Farm Fire and Cas. Co.*, No. CV-12-631, 2014 WL 1152967 at *7 (Mar. 14, 2014) (excluding expert testimony because "[a]lthough [Expert] outlined his belief as to what

---

[7] Plaintiff misleadingly cites to additional claim costs of $92,000. (Resp. at 4). This value comes from American Liberty's December 8, 2017 report issued immediately after Plaintiff's surgery six months after the ICA reversed the initial claim denial. (PSOF Exh. 5 at 3). Plaintiff points to no evidence that this amount, or any amount, was explicitly considered in the evaluation of her claim in the relevant period between September 1, 2016 and October 13, 2016. *Cf.* (DSOF ¶ 14) (S&C testimony that neither claim nor treatment costs are considered in determining compensability).

1  constitutes improper claims handling, [Expert] did not connect his opinions with the facts
2  of this case in order to support that [insurer's] claims handling conduct was motivated by
3  bad faith"). Although a failure to comply with internal company policies may raise an
4  eyebrow in some instances, Centeno provides no additional, significantly probative
5  evidence of bad faith beyond "mere metaphysical doubt." *Matsushita Elec. Indus. Co*, 475
6  U.S. at 586. The timing of reports from disinterested co-workers—requiring American
7  Liberty to conduct additional investigation through third-party adjuster DBA *starting* on
8  September 30, 2016—explains any internal delay in claim processing.[8]

Third, Centeno offers no evidence that American Liberty improperly evaluated medical evidence or failed to fully investigate her claim. Instead, Centeno points to the existence of medical evidence indicating that, on multiple occasions, she told medical providers that she was injured at work. (Resp. at 10). But this merely supports that American Liberty's investigation and eventual denial of Centeno's claim had a reasonable basis. Not only did two co-workers independently report that Centeno's injury was not job-related, but medical providers' reports also conflicted.

Fourth, Centeno broadly argues that American Liberty's investigation of her claim was inadequate. To support this claim, Centeno alludes to American Liberty's failure to directly confront her with the statements of Jueckstock and Katsaros. However, she fails to show that American Liberty had any duty to do so. Nor does she deny that she was interviewed by DBA and had opportunity to provide her own account prior to American Liberty's denial of her claim. (DSOF ¶ 38; PSOF at 6). The interview did not remove American Liberty's otherwise reasonable doubts concerning her claim's credibility. This is not alchemy. American Liberty's investigation was not unreasonable merely because Centeno disagrees with the outcome.

Even construing reasonable inferences in the non-movant's favor, a reasonable jury could not find, based on the evidence before the Court, that American Liberty unreasonably

---

[8] American Liberty complied with the ICA deadline of October 18, 2016. American Liberty's failure to comply with internal deadlines belies the thorough investigation of Centeno's claim by multiple adjusters beyond the ICA deadline.

investigated, evaluated, or processed Centeno's claim. What is more, Centeno's speculative and conclusory evidence offered lacks the probative value to raise a genuine issue of material fact regarding American Liberty's intent. Therefore, the Court will grant summary judgment in favor of American Liberty on Centeno's bad faith claim.

### c. Punitive Damages

American Liberty also seeks summary judgment on Centeno's request for punitive damages. Under Arizona law, punitive damages are not recoverable for breach of contract unless an underlying tort is proven. *See In re Marriage of Benge*, 151 Ariz. 219, 224 (App. 1986). Because Centeno has failed to prove the underlying tort of bad faith, no punitive damages are available. But even if punitive damages were available, Centeno's claim fails. A punitive damage award requires the "plaintiff to show something more than the conduct necessary to establish the tort of bad faith." *Nardelli v. Metro. Grp. Prop. & Cas. Ins. Co.*, 277 P.3d 789, 801 (Ariz. Ct. App. 2012) (citation and internal quotation marks omitted). Specifically, a plaintiff must prove that the defendant acted with an "evil mind" and (1) "intended to injure the plaintiff" or (2) "consciously pursued a course of conduct knowing that it created a substantial risk of significant harm to others." *Rawlings*, 726 P.2d at 578. Centeno does not point to evidence that allows for inference of either. Where, as here, "no reasonable jury could find the requisite evil mind by clear and convincing evidence", a motion for summary judgment should be granted. *Thompson v. Better-Bilt Aluminum Prods. Co.*, 832 P.2d 203, 211 (Ariz. 1992).

## IV. CONCLUSION

Accordingly, **IT IS ORDERED** Defendant's Motion for Summary Judgment (Doc. 95) is GRANTED.

Dated this 1st day of October, 2019.

_____
Honorable Susan M. Brnovich
United States District Judge